UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| FAYSAL HALIYE, BURHAN ABDI, ABSHIR ADEN, ABDIRAHMAN AHMED, KALID AHMED, MOHAMED AHMED, SULEYMAN ARAB, LIBAN ARTAN, BAZI SHEIKH BIN-SHEIKH, MOHAMED DUALEH, ABDULKADIR ELMI, AHMED ELMI, ADIL GATUR, AHMED HASSAN, AMIN HASSEN, HUSSEIN JAMA, ABDULKADIR MATAN, BURHAN MOHAMUD, FOZI MUSTAPHA, ZABITI OMER, IBRAHIM ROBLE, and ZEINAB YUSEF, individually and on behalf of others similarly situated, | Case No. 06-CV-4769 (PJS/JJG) |
| Plaintiffs, | |
| v. | ORDER DENYING MOTION FOR CLASS CERTIFICATION |
| CELESTICA CORPORATION and ADECCO USA, INC., | |
| Defendants. | |

---

James H. Kaster, David E. Schlesinger, and Amy S. York, NICHOLS KASTER, PLLP, for plaintiffs.

Lucinda Odell Lapoff and Erika N.D. Stanat, HARTER SECREST & EMERY LLP; and Frederick W. Vogt, MACKALL, CROUNSE & MOORE, PLC, for defendant Celestica Corporation.

Bruce J. Douglas and Carrie L. Zochert, LARKIN HOFFMAN DALY & LINDGREN LTD., for defendant Adecco USA, Inc.

Plaintiffs bring this action under Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §§ 2000e et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat.

§§ 363A.01 et seq., against defendants Celestica Corporation ("Celestica") and Adecco USA,

Inc. ("Adecco").  This matter is before the Court on plaintiffs' motion for class certification.  For

the reasons described below, plaintiffs' motion for class certification is denied.

## I.  BACKGROUND

Plaintiffs are a group of twenty-two former employees of Celestica or Adecco (or both)

who worked at Celestica's manufacturing plant in Arden Hills, Minnesota.[1]  Plaintiffs are all

practicing Muslims who allege that defendants failed to accommodate their duty to pray five

times each day.

### A.  Islamic Religious Practices

According to plaintiffs, Islam is characterized by an emphasis on the proper observance

of religious rituals.  Pls.' Ex. 6 at 1.  One of the most important Islamic rituals is the daily cycle

of prayer.  *Id.* at 1, 3.  Daily prayer is considered compulsory and is a key marker that identifies a

person as a practicing Muslim.  *Id.* at 3.  Muslims must pray five times each day, with each

prayer consisting of two or more short prayer cycles, known as rik'ah.  *Id.* at 4-5.  Muslims

prepare for prayer with a ritual washing.  *Id.* at 3.

The five daily prayers each have a name, and each is associated with a different time of

the day.  The prayers and the general time of day during which they are said are as follows:[2]

---

[1]In their opening brief, plaintiffs assert that they are "current and former" employees of
the Arden Hills plant.  But plaintiffs do not cite, and the Court cannot find, any evidence that any
of the named plaintiffs are currently employed at the plant.

[2]As discussed in more detail below, plaintiffs hold differing beliefs concerning the times
at which these prayers must be said.  The Court's description here is intended to be nothing more
than a general overview to help identify the different prayers.  In addition, the spelling of the
names of the prayers varies throughout the record.  The Court uses the spellings that seem to be
the most common.

| | |
|---|---|
| Subh (also known as Fajr) . . . | Sunrise |
| Dhuhr . . . . . . . . . . . . . . . . . . | Midday |
| Asr . . . . . . . . . . . . . . . . . . . . | Afternoon |
| Maghrib . . . . . . . . . . . . . . . . | Sunset |
| Isha . . . . . . . . . . . . . . . . . . . | Night |

Pls.' Ex. 6 at 6; A. Ahmed Dep. 84-85.  Each prayer typically takes five to ten minutes.  Pls.'

Ex. 6 at 5; Haliye Dep. 92; Aden Dep. 79-80.  On Fridays, Muslims — or, at least, male Muslims

— are expected to perform the midday prayer communally, and the prayer is accompanied by a

sermon.  Pls.' Ex. 6 at 7-8; Haliye Dep. 90-91; Jama Dep. 63; A. Ahmed Dep. 82; Gatur

Dep. 106-08; Bin-sheikh Dep. 76-77.  *But see* Omer Dep. 106-08 (stating that she always prays

by herself and that women do not need extra time for the Friday midday prayer).  The Friday

prayer and sermon together take about thirty minutes.  Pls.' Ex. 6 at 8.

The times of the prayers are based on the position of the sun in the sky.  Pls.' Ex. 6 at 6;

Haliye Dep. 79-80.  In northern latitudes, where the length of the day varies with the seasons, the

times of the prayers vary throughout the year.  Pls.' Ex. 6 at 6; Haliye Dep. 79-80.  Daylight-

saving time also affects the times of the prayers.  *See* Pls.' Ex. 56 (prayer schedule).  Mosques

and Islamic centers commonly offer free printed schedules of daily prayer times for their local

area.  Pls.' Ex. 6 at 6.  Localized schedules are also available on the Internet and over the phone.

Bin-sheikh Dep. 75.  These schedules are not always exactly the same, though; they can vary by

several minutes.  Hassan Dep. 73, 103-04.

As discussed in more detail below, the times on the schedules do not necessarily represent

the exact time that the prayers must be said.  Some plaintiffs regard a scheduled time as the

precise time at which the prayer must be prayed.  If, for example, a prayer is scheduled at 1:30

p.m., then it must be said at 1:30 p.m. — and not, say, at 1:45 p.m.  Other plaintiffs regard the

scheduled time as the beginning of a window of time during which the prayer may properly be

prayed.  But the latter group of plaintiffs have widely varying beliefs about the length of this

window, as well as differing views about the desirability of performing the prayer as close as

possible to the scheduled time.

Another important Islamic practice is the obligation to fast during the holy month of

Ramadan.  Omer Dep. 74; Jama Dep. 82.  Practicing Muslims fast during the day and break their

fast at the time of the sunset prayer.  Jama Dep. 82.

### B.  Celestica's Arden Hills Plant

Celestica manufactures circuit boards for the electronics industry.  Celestica acquired the

Arden Hills plant from its predecessor, MSL, in 2004.  Blizzard Dep. 15-16.  Adecco is a

temporary employment agency that recruits workers for Celestica and maintains an office at

Celestica's plant in Arden Hills.  Bergman Dep. 10-11, 17.

Workers at the Arden Hills plant perform a variety of production, assembly, quality-

control, and packaging jobs.  *See, e.g.*, Haliye Dep. 46-47 (describing "conformal coat operator"

position, which involves touching up chemical coating on circuit boards); A. Ahmed Dep. 36-37

(describing assembly position, which involves putting components on circuit boards in an

assembly line); A. Ahmed Dep. 46 (describing welding position, which involves inspecting and

correcting machine welds); Gatur Dep. 67-68 (describing machine-operator position); Bin-sheikh

Dep. 41-42 (describing "pack out" position, which involves packaging finished product for

shipping); *see also* Williams Dep. 24-26 (describing different jobs performed on the "front end"

of the operation).  There are three shifts at the Arden Hills plant: first shift (Mondays through Thursdays from 5:00 a.m. to 3:00 p.m.); second shift (Mondays through Thursdays from 3:00 p.m. to 1:00 a.m.); and C shift (Fridays through Sundays from 6:00 a.m. to 6:00 p.m.).  Williams Dep. 21-23; Haliye Dep. 46; M. Ahmed Dep. 54; A. Ahmed Dep. 34; Abdi Dep. 21; Jama Dep. 31; Pls.' Ex. 81.  The named plaintiffs — at least the ones who were deposed — all worked either the second shift or the C shift; apparently, none of the named plaintiffs worked the first shift.

Each shift has a set number of scheduled breaks.  The C shift has three breaks; the first and second shifts each have two breaks.  Pls.' Ex. 81.  The breaks are scheduled at different times for different areas of the plant; generally speaking, then, workers in a particular area of the plant break together.  *See* Pls.' Ex. 81.  In addition to scheduled breaks, Celestica permits employees to take bathroom breaks as needed.  Aden Dep. 80; Haliye Dep. 75; A. Ahmed Dep. 39-40; Parker Dep. 120.

For years, the Arden Hills plant has provided a space for employees to pray, commonly known as the prayer room.  Bergman Dep. 21-23; Gatur Dep. 60; Roble Dep. 93.  As discussed below, Celestica added a second prayer room in 2005 to accommodate the growing number of Muslim employees.  Bergman Dep. 82; Gatur Dep. 109-10.

### C.  Problems with Unscheduled Breaks

At the time that Celestica acquired the Arden Hills plant in 2004, Muslim employees were permitted to take breaks to pray outside of scheduled break times.  The employees and their supervisors handled the prayer breaks informally.  Muslim employees would commonly ask

coworkers to take over their work for a few minutes while they went to pray.  A. Ahmed

Dep. 41-42.  This arrangement seemed generally satisfactory to all concerned.

In the summer of 2005, however, Celestica began to strictly enforce break times in an

effort to improve productivity.  Conflict over the Muslim prayer breaks first arose in late

May 2005, when plaintiff Ahmed Elmi went to the prayer room to attend the Friday midday

prayer.  A Celestica manager, Ed Parker, followed Elmi to the prayer room to talk to Elmi about

a problem with his footwear.  Parker Dep. 121-22.  Parker noticed that there were a number of

people in the room and, because Parker knew it was not a scheduled break time, he decided to

wait until the prayer session ended in order to talk to the employees.  Parker Dep. 122.

After about thirty minutes, the group of employees left the prayer room and Parker asked

to speak with them.  Parker Dep. 122, 124.  Elmi explained that they had permission to pray;

Parker disagreed and told them that they were not allowed to take unauthorized breaks.  Ahmed

Elmi Dep. 47-50.  After admonishing the group not to take unauthorized breaks, Parker told the

group to get back to work.  Ahmed Elmi Dep. 48-50.  Parker claims that he did not plan to take

any disciplinary action in connection with the prayer, but Elmi claims that an Adecco supervisor

left him a phone message telling him not to report to work until she spoke to him on the

following Tuesday.  Parker Dep. 125-26, 129; Ahmed Elmi Dep. 55.  According to Elmi, when

he called Adecco on Tuesday, he was told that he was being terminated.  Ahmed Elmi Dep. 58-

60.  Celestica disputes this account and contends that Elmi refused to return to work.  *See, e.g.*,

Pls.' Ex. 48 at 4461-62.

The May incident turned out to be the catalyst for a series of disagreements between

workers and management over Celestica's break policy.  Celestica held meetings with employees

to discuss various workplace policies, including breaks.  Hassan Dep. 98; Haliye Dep. 105.

Celestica also began disciplining employees for taking unscheduled prayer breaks.  *See, e.g.*,

Hassan Dep. 109-12; Pls.' Ex. 25, 29-38, 41-43.  In response, the employees made formal

requests for accommodations.

In early June, a group of second-shift workers met with Celestica's general manager, who

asked them to submit a request in writing.  Haliye Dep. 105-08.  In their written request, the

workers stated that they needed prayer breaks at 6:00 p.m. and 9:00 p.m. and that they would let

Celestica know when they needed to change the break times to account for the seasonal change in

the length of the day.  *See* Defs.' Ex. 3.  Celestica denied this request.  Pls.' Ex. 45.

At about the same time, a group of C-shift workers met with management and submitted

a written request asking to be allowed to "pray the regular prayers as usual" and requesting a

fifteen-minute break between 1:00 p.m. and 2:00 p.m. on Fridays.  Defs.' Ex. 4.  Celestica also

denied this request, but permitted C-shift employees to combine their Friday afternoon break

with their lunch break.  Pls.' Ex. 46; Defs.' Ex. 30.

Workers also submitted individual requests for accommodation.  *See, e.g.*, Defs.' Ex. 6.

Celestica met with individual employees to discuss their accommodation requests and to mete

out discipline — and sometimes did both in the course of the same meeting.  Hassan Dep. 114;

Bergman Dep. 63-64, 77; Pls.' Ex. 25, 29-38, 41-43.

During this period of time, a couple of the named plaintiffs lost their jobs, although the

surrounding circumstances are somewhat murky.  Plaintiff Faysal Haliye was suspended in mid-

June for taking an unauthorized break.  Haliye Dep. 115-18.  Haliye spoke with Celestica

management once or twice after that, but did not respond to two letters sent to him by Celestica

— one of which offered breaks at 6:00 p.m. and 9:00 p.m. or, alternatively, a transfer to first shift. *See* Defs.' Ex. 10, 11. Similarly, plaintiff Ahmed Hassan was also suspended in mid-June for taking an unauthorized break. Hassan Dep. 113-15. Hassan, who worked for Adecco, was never told to come back to work and never heard from Celestica again, although he did receive a letter asking him to contact Adecco if he was interested in a position with Adecco. Hassan Dep. 115-19.

Near the end of June, Celestica received a letter from "All concerned associates" requesting prayer breaks for the C shift as follows:

| | |
|---|---|
| March through September | 1:30 p.m.<br>4:00 p.m.<br>5:20 p.m. (summertime) |
| October through February | 6:30 a.m.<br>1:05 p.m. (12:30 p.m. wintertime)<br>4:30 p.m. (3:30 p.m. wintertime)<br>5 minutes after sunset |

Defs.' Ex. 5. At about the same time, several employees contacted the Council on American-Islamic Relations ("CAIR"), a Washington, D.C.-based advocacy group. M. Ahmed Dep. 36-37. CAIR wrote a letter to Celestica demanding, among other things, that Muslim employees be allowed to take a break as needed to pray the sunset prayer. *See* Pls.' Ex. 48. Celestica wrote back and expressed both a desire to accommodate its employees and confusion due to what it described as the employees' inability to provide a consistent and understandable account of their need for accommodation. *Id.*

The parties reached a truce of sorts in July, when Celestica temporarily implemented a break schedule to accommodate prayers while it evaluated whether to implement permanent

changes to the break schedule.  Bergman Dep. 53-54; Defs.' Ex. 13; Defs.' Ex. 17.  Celestica

also added a second prayer room to accommodate Muslim employees.  Bergman Dep. 82; Gatur

Dep. 109-12; Pls.' Ex. 54.  Most — but not all — of the plaintiffs were satisfied with the

temporary July schedule.  Abdi Dep. 76 (temporary schedule solved his problem); Gatur

Dep. 121-122 (as modified, temporary schedule met his needs); Roble Vol. II Dep. 134 (he was

unable to pray during scheduled breaks in July and August); Parker Dep. 137 (some employees

needed further modifications to the temporary break schedule).

        In August, Celestica implemented a new permanent break schedule.  Bergman Dep. 53.

The changes to the break schedule included adding ten minutes to the first and second shift break

schedules, providing a different break schedule for daylight-saving time, and permitting

employees to take their Friday lunch break at any of three designated times.  Bergman Dep. 55-

56; Parker Dep. 81-82; Pls.' Ex. 55.  Celestica also permitted employees to switch shifts for the

purpose of accommodating their religious needs.  Defs.' Ex. 31.  At some point (apparently later

in the fall), Celestica also consulted Amin Kader, a professor at Augsburg College and president

of the Islamic Institute of Minnesota.  Bergman Dep. 83-87; Parker Dep. 66; Williams Dep. 87.

According to Celestica, Kader opined that the new schedule was an acceptable accommodation.[3]

Parker Dep. 66, 100-01.

        The new schedule apparently did not please some of the plaintiffs.  Shortly after the new

schedule was implemented, a number of plaintiffs were disciplined and terminated for taking

unauthorized breaks.  Pls.' Exs. 58-61; Omer Dep. 123-24; Mustapha Dep. 132-34; M. Ahmed

_____

        [3]Kader remembers advising Celestica about the creation of a prayer room to
accommodate the Friday group prayer, but denies reviewing Celestica's break schedule.  Kader
Dep. 19-20, 27.

Dep. 80-81; Abdi Dep. 97-98; Arab Dep. 89-90.  After this rash of terminations, things seemed to quiet down for the next few weeks.  But as fall approached, C-shift employees notified management that the end of Ramadan was going to coincide with the change from daylight-saving time to standard time.  *See* Pls.' Ex. 47; Aden Dep. 117-18, 120; Roble Vol. II Dep. 153-54.  This meant that sunset, which during daylight-saving time did not take place until just after the end of the work day, would instead occur about an hour before the end of the C-shift.  *See* Pls.' Ex. 56 (change in prayer times from October 29 to October 30).

On October 30, a number of C-shift employees took an unauthorized break from 5:00 p.m. to 5:30 p.m. to pray and break their fast.  Pls.' Exs. 63, 65; Bin-sheikh Dep. 121-22; A. Ahmed Dep. 105-06; Jama Dep. 81-82; Aden Dep. 117-18; Pls.' Ex. 21.  Celestica terminated the Adecco employees and suspended the Celestica employees.  Pls.' Ex. 21.  After returning to work, many of the Celestica employees — including most if not all of the remaining named plaintiffs — were again suspended for taking unauthorized breaks.  Although Celestica attempted to contact these plaintiffs and offered them the chance to change shifts, plaintiffs did not respond to Celestica's attempts and never returned to work.  *See, e.g.*, A. Ahmed Dep. 106-08;  Defs.' Ex. 16; Gatur Vol. II Dep. 147-50; Defs.' Exs. 19-20; Bin-sheikh Dep. 123-25; Roble Vol. II Dep. 156-62; Defs.' Ex. 24.  Plaintiffs filed this action in December 2006.

## II.  CLASS CERTIFICATION

Plaintiffs seek to represent a class defined as follows:

> All past, present, and future Muslim employees of Celestica or Adecco at Celestica's Arden Hills Facility who want(ed) to pray according to the Muslim prayer schedule, at times that do(did) not correspond with Celestica's authorized break schedule.

Pls.' Mot. Class Cert.[4]

For a class to be certified, plaintiffs must meet all of the criteria of Rule 23(a) and fall within one of the categories of Rule 23(b).  Plaintiffs bear the burden of showing that the class should be certified and that the requirements of Rule 23 are met.  *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994).  District courts have wide discretion in determining whether certification of a class is appropriate.  *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980).  But district courts must exercise that discretion within the standards set by Rule 23, which requires a "rigorous analysis" to ensure that class certification is appropriate.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

In deciding whether to certify a class under Rule 23, a district court may not consider whether plaintiffs have a strong claim on the merits.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).  In other words, a district court may not deny class certification because it views the plaintiffs' claims as weak or grant class certification because it views the plaintiffs' claims as strong.  Nevertheless, a district court may look beyond the pleadings and assess the state of the evidence.  In particular, a district court may analyze what the plaintiffs will have to prove and how the plaintiffs will have to prove it.  *See Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006) ("Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove."); *Blades v. Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005) (in determining whether common issues predominate, courts may resolve factual issues to the extent

---

[4]In their reply brief, plaintiffs propose that the class definition be limited to Muslim employees who worked at Arden Hills on or after May 27, 2005.  Pls.' Reply 2.

necessary to determine whether the same evidence will suffice to prove the claims of all class members).

### A.  Rule 23(a)

The four prerequisites for class certification under Rule 23(a) are numerosity, commonality, typicality, and adequacy.  After careful consideration, the Court concludes that plaintiffs have failed to meet the prerequisite of commonality.

For a class to be certified, there must be a question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2).  "The rule does not require that every question of law or fact be common to every member of the class . . . ."  *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982).  At the same time, not every common question of law or fact will suffice to meet the commonality requirement.  In every putative class action, the plaintiffs share in common the ultimate question, such as "Did the defendants fail to accommodate the plaintiffs' religious practices?"  But that does not mean that every putative class action meets the commonality requirement.  "In order to determine whether there is truly a common question of law or fact for purposes of Rule 23(a)(2), a court must dig deeper and identify the legal and factual issues on which the ultimate question will turn." *Good v. Ameriprise Fin., Inc.*, 248 F.R.D. 560, 569 (D. Minn. 2008).  To be considered a common question of fact (or law), the issue must be susceptible to class-wide resolution.  *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).  In other words, the question must be precisely the same for every single member of the class, so that, based on evidence and argument common to the class, the jury (or judge) can answer that question once, and that single answer will dispose of that factual (or legal) question with respect to all class members.

Plaintiffs bring a claim under 42 U.S.C. § 2000e-2(a),[5] which states, in relevant part:

> It shall be an unlawful employment practice for an employer —
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

Although § 2000e-2(a) does not mention a duty of reasonable accommodation, the definition of "religion" in Title VII incorporates a duty to accommodate religious beliefs and practices:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).  Taken together, these provisions establish that it is unlawful for an employer to fail to reasonably accommodate the religious beliefs and practices of its employees, unless such an accommodation would create undue hardship.  *Wren v. T.I.M.E.-D.C., Inc.*, 595 F.2d 441, 445 (8th Cir. 1979).

To establish a prima facie case of failure to accommodate a religious belief or practice, a plaintiff must show that: (1) she has a bona fide religious belief or practice that conflicts with an employment requirement; (2) she informed her employer of her belief or practice; and (3) she was disciplined for failing to comply with the conflicting employment requirement.  *See Jones v. TEK Indus., Inc.*, 319 F.3d 355, 359 (8th Cir. 2003); *Wilson v. U.S. West Commc'ns*, 58 F.3d

---

[5]The parties focus on plaintiffs' Title VII claim and do not contend that plaintiffs' MHRA claim alters the analysis.  *Cf. Benjamin v. County of Hennepin*, No. C8-96-1122, 1996 WL 679690, at *3 (Minn. Ct. App. Nov. 26, 1996) (citing cases under Title VII to analyze a religious-accommodation claim under the MHRA).

1337, 1340 (8th Cir. 1995).  Once a plaintiff has established a prima facie case, an employer can

avoid liability by showing that it has offered a reasonable accommodation or by showing that

accommodating the belief or practice would impose an undue hardship.  *See Ansonia Bd. of*

*Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) ("By its very terms the statute directs that any

reasonable accommodation by the employer is sufficient to meet its accommodation

obligation. . . . Thus, where the employer has already reasonably accommodated the employee's

religious needs, the statutory inquiry is at an end."); *Seaworth v. Pearson*, 203 F.3d 1056, 1057

(8th Cir. 2000) (per curiam) ("Once a plaintiff establishes a prima facie case, the burden shifts to

the employer to show that accommodation would result in undue hardship to the employer.").

An accommodation creates an undue hardship when it requires an employer to bear more

than a de minimis burden — a burden reflected either in increased costs or decreased efficiencies.

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *Mann v. Frank*, 7 F.3d 1365,

1370 (8th Cir. 1993).  Speculative evidence of the future impact of an accommodation is not

sufficient to show undue hardship; the costs must be present and real rather than hypothetical.

*Cook v. Chrysler Corp.*, 981 F.2d 336, 339 (8th Cir. 1992).  At the same time, the costs need not

be quantifiable or "ascertained with exactitude . . . ."  *Id.*

What constitutes a "reasonable accommodation" is a highly fact-intensive inquiry that

depends on the totality of the circumstances:

> What is reasonable depends on the totality of the circumstances
> and therefore might, or might not, require elimination of a
> particular, fact-specific conflict. . . .
>
> . . . To be sure, there may be many situations in which the only
> reasonable accommodation is to eliminate the religious conflict
> altogether.  But in close cases, that is a question for the jury

-14-

> because it turns on fact-intensive issues such as work demands, the
> strength and nature of the employee's religious conviction, the
> terms of an applicable CBA, and the contractual rights and
> workplace attitudes of co-workers.  Bilateral cooperation under
> Title VII requires employers to make serious efforts to
> accommodate a conflict between work demands and an employee's
> sincere religious beliefs.  But it also requires accommodation by
> the employee, and a reasonable jury may find in many
> circumstances that the employee must either compromise a
> religious observance or practice, or accept a less desirable job or
> less favorable working conditions.

*Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024, 1030, 1033 (8th Cir. 2008).  The employer

does not bear sole responsibility for crafting a reasonable accommodation and will not be held

liable if an employee's failure to cooperate makes it impossible for the employer to reach such an

accommodation.  *See Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285-86 (8th Cir. 1977) ("Where

an employee refuses to attempt to accommodate his own beliefs or to cooperate with his

employer's attempt to reach a reasonable accommodation, he may render an accommodation

impossible.  In such a case, the employee himself is responsible for any failure of

accommodation and his employer should not be held liable for such failure.").

    As this brief overview demonstrates, the outcome of a Title VII religious-accommodation

claim is highly dependent on the specific facts of the claim.  Establishing a prima facie case

requires an individualized inquiry into whether the plaintiff has a bona fide religious belief,

whether the plaintiff informed her employer of her belief, and whether the plaintiff suffered

discipline as a result of her failure to comply with a conflicting employment requirement.  To

determine whether a proposed accommodation was reasonable or would have imposed an undue

hardship, a jury must consider such individualized factors as the nature of the plaintiff's job

duties, the nature and strength of the plaintiff's religious beliefs, the nature of the employer's

efforts to accommodate her beliefs, and the plaintiff's reaction to the employer's accommodation efforts.

None of these issues can be resolved on a class-wide basis in this case. Each plaintiff's case presents a unique combination of factors that bear on the issues of reasonable accommodation and undue hardship. Most strikingly, plaintiffs do not hold uniform beliefs about when they are required to pray — the issue that lies at the heart of this case. At one extreme are plaintiffs who testified that it is necessary to pray at least some of the prayers at the exact times on the printed schedule, with, at most, a five- or ten-minute window in which the prayer can be performed. *See* A. Ahmed Dep. 87-88, 135; Matan Dep. 55; Roble Dep. 83-84; Bin-sheikh Dep. 76; Omer Dep. 80-81. At the other extreme are plaintiffs who testified that at least some of the prayers can be performed anytime between the start time for that prayer and the start time for the next prayer — a window that could be several hours long. *See* Jama Dep. 55-59; Mustapha Dep. 90-94; Aden Dep. 92-93. In the middle are plaintiffs who gave varying estimates of the length of the time period during which prayers may be performed. *See* Haliye Dep. 83-87; Gatur Dep. 92-97; Abdi Dep. 45; Ahmed Elmi Dep. 78-79, 82-83; Hassan Dep. 71-73; Arab Dep. 60-62; Abdulkadir Elmi Dep. 58.

Some plaintiffs testified that the window of time for prayer varies with the seasonal change in the length of the day. *See* Abdulkadir Elmi Dep. 58; Gatur Dep. 92-93; Ahmed Elmi Dep. 82-83; Jama Dep. 53-55. Some plaintiffs state that prayers may be performed anytime during the appropriate window, while others state that, although it is technically acceptable to perform prayers anytime within the window, it is preferable to perform each prayer as close as possible to the scheduled start time. *Compare* Ahmed Elmi Dep. 76-78 *and* Arab Dep. 70 *with*

Abdi Dep. 43-44 *and* Jama Dep. 53.  One plaintiff testified that the Friday midday prayer is always performed at one o'clock, while other plaintiffs perform the Friday midday prayer at different times depending on the season of the year.  *Compare* Jama Dep. 62-63 (Friday midday prayer is fixed at 1:00 p.m. throughout the year) *with* Ahmed Elmi Dep. 46-47 (describing a 12:30 p.m. Friday midday prayer).

Notably, plaintiffs' views differ significantly from those of their proffered expert, Omid Safi.  For example, Safi calculated that the window of time for the sunrise prayer on September 17, 2008 was nearly two hours.  Pls.' Ex. 6 at 6.  But almost none of the plaintiffs testified that the window for the sunrise prayer exceeds even one hour; to the contrary, most testified that the window is much shorter.  *See, e.g.*, Jama Dep. 54 (one and a half hours); Haliye Dep. 83-84 (fifteen minutes); A. Ahmed Dep. 85-88 (eight or nine minutes); Gatur Dep. 92 (one hour); Omer Dep. 80-81 (five to ten minutes); Hassan Dep. 72 (fifteen to thirty minutes); Arab Dep. 61 (forty-five minutes to an hour).

Plaintiffs' beliefs about the timing of their prayers is the most obvious example of a circumstance that will be highly relevant to the issue of reasonable accommodation and that differs substantially from plaintiff to plaintiff.  It is by no means the only such circumstance.  Other individualized circumstances include the type of job each plaintiff held, the shift each plaintiff worked, and the particular circumstances under which each plaintiff was disciplined for taking an unauthorized break to pray.

Plaintiffs held a variety of jobs at Celestica.  Some of them worked in interdependent teams; others worked independently.  Haliye Dep. 46 (conformal coat operators work independently); A. Ahmed Dep. 36-37 (assembly-line workers work in groups); A. Ahmed

Dep. 46 (welders work independently); Gatur Dep. 67-68 (machine operators work in groups of three); Bin-sheikh Dep. 42 (packaging employees work together); Omer Dep. 48, 50 (describing working in an assembly line with groups of varying sizes). Plaintiffs also worked at different times of the day and on different days of the week, which affected the extent to which their religious needs conflicted with their work requirements.

Similarly, as discussed above, plaintiffs were suspended or terminated at different times and under different circumstances. Some plaintiffs lost their jobs before Celestica made any changes to the break schedule. Others were not terminated until after Celestica attempted to devise a break schedule that would accommodate their religious needs. Some plaintiffs were apparently able to reconcile themselves to Celestica's new break schedule at first but ran into problems later as a result of the changing seasons and the return to standard time on the last day of Ramadan. Some plaintiffs were satisfied with Celestica's temporary July schedule; others needed additional modifications or thought that the schedule did not go far enough. In many instances, plaintiffs who were suspended ignored Celestica's attempts to communicate with them, which obviously puts them on a different footing than plaintiffs who were terminated outright. In addition, there is evidence that Celestica and Adecco employees were treated differently; after the October 30 incident, Celestica terminated the Adecco employees but only suspended its own employees.

All of these circumstances — circumstances that differ substantially from plaintiff to plaintiff — will bear on the issues of whether any given accommodation was reasonable, whether any given accommodation would have created an undue hardship, and whether any given employee rendered an accommodation impossible by refusing to cooperate. *Cf. Sturgill*, 512

F.3d at 1030, 1033 (stating that what is reasonable depends on the "totality of the circumstances" including "fact-intensive issues such as work demands, the strength and nature of the employee's religious conviction, the terms of an applicable CBA, and the contractual rights and workplace attitudes of co-workers").  As a result, plaintiffs cannot meet the commonality requirement.

Plaintiffs attempt to sweep aside the many differences among them by claiming that the ultimate question in this case is whether it would be a reasonable accommodation to permit class members to pray "according to the Muslim prayer schedule . . . ."[6]  Plaintiffs do not define "the Muslim prayer schedule," though.  Apparently, they mean the times on a printed prayer schedule, but they do not identify *which* printed prayer schedule — and, as noted, printed schedules often differ on when certain prayers must be prayed.  Setting that aside, plaintiffs' question cannot be answered on a class-wide basis because it depends on individualized circumstances such as the nature of each plaintiff's job duties and each plaintiff's own beliefs about the necessity of praying at a particular time.  The Court therefore concludes that plaintiffs have failed to satisfy the prerequisite of commonality.

### B.  Rule 23(b)

Although the Court has already concluded that plaintiffs have failed to meet the threshold requirement of commonality, the Court also notes that certification would not be warranted under Rule 23(b).

---

[6]Specifically, plaintiffs posit the following question as a common question:  "Whether the Celestica Arden Hills facility's policy of refusing to allow Muslim employees to take a nominal amount of time for prayer according to the Muslim prayer schedule when that time did not coincide with Celestica's break schedule is a refusal to make a reasonable religious accommodation."  Pls.' Mem. Supp. Class Cert. 22.

1.  Rule 23(b)(2)

Plaintiffs first argue that the Court should certify a class under Rule 23(b)(2), which states that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  Certification under Rule 23(b)(2) is proper "only when the primary relief sought is declaratory or injunctive."  *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005); *see also* Fed. R. Civ. P. 23 advisory committee notes, 1966 amendment, subdivision (b)(2) ("The subdivision [(b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.").

Here, none of the named plaintiffs is currently working at Celestica.  Of the twenty-two named plaintiffs, only five express unqualified interest in returning to work there.  The remaining plaintiffs express only tepid or qualified interest, or they actually express a desire *not* to return.  Given that the majority of the named plaintiffs show little or no interest in reinstatement, the Court concludes that the final relief in this case will relate predominantly to money damages.  Certification under Rule 23(b)(2) is therefore inappropriate.[7]

---

[7]After oral argument on plaintiffs' motion, Celestica announced that it planned to close the Arden Hills plant in November 2009 and filed a letter arguing that this circumstance also renders Rule 23(b)(2) certification inappropriate.  The plant remains open at this time, however, and there is nothing that would prevent Celestica from changing its mind and deciding to continue operating it.  The Court therefore declines to hold that Celestica's intention to close the plant moots plaintiffs' claim for injunctive relief.

2.  Rule 23(b)(3)

In the alternative, plaintiffs seek certification under Rule 23(b)(3), which states, in relevant part, that a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Even if there were a question common to the class, that question would not predominate over the numerous individual questions that will have to be resolved.  Certification under Rule 23(b)(3) is thus also inappropriate.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that plaintiffs' motion to certify class [Docket No. 31] is DENIED.

Dated: June  10 , 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge